_____

LUZ M. SANCHEZ, as Administrator of the Estate of
Pedro A. Sanchez, Jr.,

                        Plaintiff,

-vs-

NEW YORK CORRECT CARE SOLUTIONS MEDICAL
SERVICES, P.C., CORRECT CARE SOLUTIONS, LLC,
CORRECT CARE SOLUTIONS GROUP HOLDINGS, LLC,
KAITLIN HEASTER, JENNIFER MCGREGOR, EDWARD
FREELY, JANICE MCKAE, MARY STAPLETON,
COUNTY OF MONROE, CHRISTOPHER SHELLARD,
THOMAS GALEN, JANE WEBSTER,

                        Defendants.

DECISION and
ORDER

16-CV-6826 CJS

_____

## APPEARANCES

For Plaintiff:      Elmer R. Keach, III
                    Law Offices of Elmer Robert Keach, III, PC
                    One Pine West Plaza, Suite 109
                    Albany, New York 12205

For Defendants:    Paul A. Sanders
                    Barclay Damon, LLP
                    2000 HSBC Plaza
                    100 Chestnut Street
                    Rochester, New York 14604

## INTRODUCTION

This action arises from the death of Pedro Sanchez, who succumbed to injuries

sustained while he was a pretrial detainee at the Monroe County Jail in Rochester, New

York. The action asserts federal civil rights claims under 42 U.S.C. § 1983 and tort claims

under New York State law. Now before the Court is Defendants' motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docket No. [#17]) and Plaintiff's cross-motion to amend (Docket No. [#26]). Both applications are granted in part and denied in part, with the result being that the Second Amended Complaint is now the operative pleading, the request to dismiss the first cause of action is denied, the request to dismiss the third and fourth causes of action is granted and the request to dismiss the second cause of action is granted as to Monroe County but denied as to the remaining defendants named in that claim.

BACKGROUND

For purposes of this Decision and Order, the Court takes the following facts as set forth in the proposed Second Amended Complaint [#26-2] to be true. On or about January 20, 2015, Pedro Sanchez, Jr. ("Sanchez") became confined at the Monroe County Jail as a "pretrial detainee."[1] At all relevant times during Sanchez's confinement, Monroe County had contracted with Correct Care Solutions, LLC, New York Correct Care Solutions Medical Services, P.C. and/or Correct Care Solutions Group Holdings, LLC, to provide medical care at the jail. At that same time, Correct Care Solutions, LLC employed Kaitlin Heaster ("Heaster"), Jennifer McGregor ("McGregor"), Edward Freely ("Freely") and Jane Webster ("Webster") as registered nurses at the jail and employed Janice McKae ("McKae") and Mary Stapleton ("Stapleton") as physicians' assistants at the jail. Correct Care Solutions also employed Christine Ross ("Ross") as the Health Services Administrator for the jail. At all relevant times, Monroe County employed Christopher Shellard ("Shellard") as a Sheriff's Sergeant at the jail and Thomas Galen ("Galen") as a Sheriff's Deputy at the jail.

---

[1] Second Amended Complaint [#26-2] at ¶ 66 ("Mr. Sanchez was a pre-trial detainee.").

On February 1, 2015, at approximately 7:30 a.m., Sanchez was involved in a fight with two jail inmates who repeatedly punched him in the abdomen. Following the altercation, Sanchez complained of pain in his left shoulder, and jail staff transported him to the hospital for evaluation. Hospital staff diagnosed Sanchez with a dislocated shoulder but failed to diagnose the fact that he also had a laceration to his spleen. Apparently, at that time Sanchez was not yet exhibiting symptoms of the spleen injury. Hospital staff discharged Sanchez back to the jail with his arm in a sling, and gave directions that he should be returned to the hospital emergency room if his condition worsened.

As described in more detail below, Sanchez's condition worsened drastically during the rest of that day and into the morning of the next day, as the spleen laceration became symptomatic. Specifically, "Sanchez exhibited medical symptoms commonly associated with a ruptured spleen and internal bleeding, including severe pain and burning in his abdomen, pain near his rib cage, a distended abdomen, a drop in blood pressure, fainting, dizziness, restlessness, paleness, jaundice, anxiety, shortness of breath and tachycardia."[2]

At approximately 9:15 p.m. on February 1, 2015, Sanchez complained to a corrections officer[3] that he was nauseous and had persistent pain in his abdomen below his left ribs. The corrections officer requested a medical evaluation, and Nurse Heaster examined Sanchez. Heaster noted that Sanchez was pacing in his cell and asking for pain medications, and that he claimed to have difficulty breathing.[4] Heaster observed

---

[2] Proposed Second Amended Complaint [#26-2] at ¶ 19.
[3] Officer Messura, who is not a party to this action.
[4] Proposed Second Amended Complaint [#26-2] at ¶ 26.

that Sanchez had diminished breath sounds in one lung, an oxygen saturation of 98% and blood pressure of 130/86. Based upon these findings, Heaster did not contact a doctor. Further, although Sanchez was complaining of abdominal pain, Heaster did not examine his abdomen, though if she had, she would have noticed that his abdomen was distended due to internal bleeding.

For approximately the next two hours, Sanchez continued yelling and screaming for help and kicking the door of his cell. Sanchez continued to complain of pain, difficulty breathing and feeling sick to his stomach. Thereafter, and prior to approximately 11:30 p.m., Heaster checked on Sanchez several more times "and cleared him to remain in reception."[5] Nurse McGregor also "evaluated" Sanchez (though the details of that evaluation are not pleaded) and gave him Tylenol for pain.

At approximately 11:30 p.m., McGregor examined Sanchez again at the request of a corrections deputy and placed him on constant observation due to his complaints of pain all over his body, including pain in the stomach region and rib area. However, McGregor did not complete a comprehensive nursing assessment. McGregor also did not contact a doctor, and instead chose to wait to have Sanchez examined by a doctor the next day. At approximately midnight, McGregor examined Sanchez again, but did not make any note of her evaluation.

At approximately 3:00 a.m. on February 2, 2015, McGregor noted that Sanchez was continuing to complain of abdominal pain, rib pain, pain all over his body, shortness of breath and weakness. McGregor noted that Sanchez had an abnormally high and irregular heartbeat, but normal blood pressure. However, as with her earlier checks of

---

[5]Proposed Second Amended Complaint [#26-2] at ¶ 27.

Sanchez's vital signs, McGregor examined him only through the bars of his cell, did not perform an adequate nursing assessment and did not contact a doctor.

At approximately 5:20 a.m., Sanchez told a corrections officer that he felt sick and had just fainted. The corrections officer summoned medical staff, and about an hour later, McGregor and Nurse Freely arrived and observed that Sanchez was on all fours, complaining about pain and shortness of breath and requesting to go to the hospital. In fact, Sanchez told McGregor that he was going to kill himself if he was not hospitalized. McGregor and Freely checked Sanchez's vital signs, noting that his blood pressure was 110/60 and falling, and that his oxygen saturation rate had dropped to 94%. Nevertheless, without consulting a doctor, McGregor and Freely decided that Sanchez was stable and could wait until later that day to see a doctor.

However, McGregor and Freely had Sanchez moved to a cell where he could be constantly observed, in response to his threat to kill himself. Sanchez had to be transported to the observation cell in a wheelchair, because he was in too much pain to walk. Video footage indicates that during this transport Sanchez was slumped over in the wheel chair. At the new cell, Sanchez continued to complain of pain, fainting and difficulty breathing. At approximately 5:50 a.m. and then again at 6:20 a.m., McGregor and Freely observed that Sanchez was continuing to beg to be taken to the hospital, as well as threatening to kill himself if he was not taken to the hospital. McGregor and Freely observed that Sanchez's blood pressure and oxygen saturation rate were continuing to drop, but they nevertheless decided that he could continue waiting to see a doctor.

During the next few hours, Physician's Assistants Stapleton and McKae, who were part of the jail's mental health staff, attempted to interview Sanchez but were unable to

do so because he was agitated, complaining of abdominal pain, writhing in pain and splashing water on his face. However, neither Stapleton or McKae called a doctor or sent Sanchez to the hospital. At approximately 9:30 a.m., McKae attempted to give Sanchez some type of medication which he refused. Presumably at that time, Sanchez was still agitated, complaining of abdominal pain, writhing in pain and splashing water on his face.

McKae then spoke with McGregor and Webster about Sanchez. McGregor stated that she was aware of the situation and that Sanchez was just trying to get to the hospital, while Webster stated that they knew Sanchez, and that he was "an asshole."[6]

At approximately 9:35 a.m., Sanchez asked for assistance from Sergeant Shellard and Deputy Galen, who observed that Sanchez was "working himself into a panic." Sanchez "complained that he had burning pain in his stomach [and] that he needed help [and] to see medical staff."[7] However, neither Shellard or Galen contacted medical staff. Instead, Shellard checked Sanchez's medical chart and informed him that medical staff were scheduled to check on him soon.

At approximately 9:52 a.m. on February 2, 2015, Sanchez again told Shellard that he needed to go to the hospital. Shellard observed that Sanchez was "upset, pacing in his cell, stepping up and down from his bed, working himself into a panic and demanding to see medical staff."[8] Shellard told Sanchez to settle down, but did not call medical staff.

Approximately one hour later medical staff found Sanchez unresponsive in his cell, whereupon they had him transported to the hospital where he died later that day.

---

[6] Proposed Second Amended Complaint [#26-2] at ¶ 43.
[7] Proposed Second Amended Complaint [#26-2] at ¶ 42.
[8] Proposed Second Amended Complaint [#26-2] at ¶ 44.

Sanchez's sister, Plaintiff Luz Sanchez, obtained limited letters of administration from the Monroe County Surrogate's Court to pursue claims on Sanchez's behalf.  On December 17, 2016, Plaintiff commenced this action.

On April 28, 2017, Plaintiff filed an Amended Complaint [#14] that purported to assert four causes of action: 1) a § 1983 claim against Heaster, McGregor, Freely, McKae, Stapleton, Webster, Shellard and Galen, based upon deliberate indifference to Sanchez's serious medical needs in violation of the 8th Amendment; 2) a § 1983 *Monell* claim against Monroe County, Correct Care Solutions, LLC, Correct Care Solutions Group Holdings, LLC and Christine Ross, alleging that the violation of Sanchez's constitutional rights occurred due a policy of providing inadequate medical care at the jail in order to achieve cost savings; 3) a negligence claim under New York law for Sanchez's conscious pain and suffering against "all Correct Care Solutions Defendants" (defined to include New York Correct Care Solutions Medical Services, P.C., Correct Care Solutions LLC, Correct Care Solutions Group Holdings, LLC, Heaster, McGregor, Freely, McKae, Webster and Stapleton); and 4) a wrongful death claim under New York law against "all Correct Care Solutions Defendants."

On May 30, 2017, Defendants filed a motion [#17] to dismiss the Amended Complaint.  Defendants contend that the first cause of action fails to state a claim, since the allegations establish that the individual medical providers were not deliberately indifferent to Sanchez's conditions, but at most committed errors in professional judgment.  Defendants contend that the second cause of action fails to state a *Monell* claim inasmuch as it does not identify any policy or widespread practice of ignoring inmates' spleen injuries, and that insofar as the pleading alleges that the Correct Care

companies had a policy of cutting corners to increase their profit margin, the allegations are conclusory. Defendants further contend that the third and fourth causes of action are barred as against Monroe County, Shellard and Galen based on Plaintiff's failure to comply with New York General Municipal Law and, alternatively, that those Amended Complaint fails to plausibly plead negligence against McKae, Shellard or Galen.

On July 14, 2017, Plaintiff filed a response [#23] to Defendants' motion. Regarding the constitutional claims, Plaintiff asserts that the constitutional claims are based on the 14th Amendment, not the 8th Amendment, due to the fact that Sanchez was a "pretrial detainee."[9] Plaintiff also contends that in light of Sanchez's symptoms and repeated pleas for help, "[t]here is no reasonable explanation for [Defendants'] abject failure to help [him] except either a callous indifference to a dying human being and/or an unwritten policy by CCS that instructed medical staff not to send detainees to the hospital unless they are evaluated by a CCS physician."[10] Regarding the *Monell* claim, Plaintiff further contends that Monroe County cannot insulate itself from liability for constitutional violations by "outsourcing" its obligation to provide medical care to inmates, and that the County is therefore liable for its policy of "hiring a for-profit medical company with a troubled history on a capitation contract [that] guarantees bad health outcomes for detainees."[11] Regarding the state-law claims, Plaintiff contends that she has adequately stated claims, and also clarifies that the requirements of New York's General Municipal Law are irrelevant as those claims are being asserted only against the Correct Care Defendants,

---

[9] Docket No. [#23] at p. 16.
[10] Docket No. [#23] at p. 13.
[11] Docket No. [#23] at p. 26; *see also, id.* at p. 28 ("The County of Monroe was on notice of the need to avoid hiring a private medical company who employed a capitation business model, and who let profit the motive interfere with providing necessary medical care to detainees.").

and not Monroe County, Shellard or Galen.

On August 14, 2017 Defendants filed a reply [#24]. In addition to reiterating their earlier arguments, Defendants indicate that regardless of whether Plaintiff's deliberate indifference claim is asserted under the 8th or 14th Amendments, the pleading fails because "Sanchez did not exhibit an acute medical emergency and his complaints were promptly and frequently addressed."[12]   Additionally, Defendants raise a new argument that the state-law claims against the Correct Care Solutions defendants are barred because Plaintiff did not comply with New York CPLR § 3012-a, which requires plaintiffs to file a certificate of merit in actions alleging medical malpractice.[13]

On November 2, 2017, counsel for the parties appeared before the undersigned for oral argument.[14]   As part of the discussion, the Court questioned Plaintiff's counsel about the theory under which he was pleading *Monell* liability[15] and whether he had stated an actionable claim.   In response to the Court's questions, Plaintiff's counsel requested and was granted an opportunity to file a further amended pleading.   The Court indicated that Plaintiff should file any such motion within "two weeks."

On November 16, 2017, Plaintiff filed a motion [#26] for leave to file a Second Amended Complaint.   The revisions to the Proposed Second Amended Complaint relate

---

[12] Docket No. [#24] at p. 9.

[13] "The statute requires counsel to submit a certificate of merit declaring that he or she has consulted with at least one licensed physician who is knowledgeable regarding the relevant issues in the action, has reviewed the case, and has concluded that there is a reasonable basis for commencement of an action." *Revels v. Corr. Med. Care, Inc.*, No. 917CV0088MADTWD, 2018 WL 1578157, at *7 (N.D.N.Y. Mar. 28, 2018) (citation and internal quotation marks omitted).

[14] Defendant's counsel clarified that he does not represent Stapleton (who is believed to be deceased) or Freely, and that while he represents Webster she was not one of the movants.

[15] "To plead a *Monell* claim, a plaintiff must allege the existence of a formal policy which is officially endorsed by the municipality, or a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (citation omitted).

primarily to Plaintiff's theories of *Monell* liability.  For example, the proposed amended pleading alleges as evidence of the Correct Care Solutions Defendants' policy of deliberate indifference, that Correct Care improperly delegated to nurses the authority to make "medical determinations" during evening hours and at other times when doctors were not working.  The proposed pleading further alleges that Monroe County was "well aware" of Correct Care's deficient business practices based on information that the County would have obtained during the process of bidding the contract.    The proposed amended pleading also now pleads the medical deliberate indifference claims alternatively as arising under the 8th Amendment or 14th Amendment.

On January 9, 2018, Defendants filed papers [#28][#29] opposing Plaintiff's request for leave to amend.  Defendants contend that the proposed amendment would be futile, since in addition to its other deficiencies the proposed pleading still fails to adequately plead a *Monel*l claim. [16]

ANALYSIS

Where, as in this case, a court has before it both a motion to dismiss and a cross-motion to amend, it "has a variety of ways in which it may deal with the pending motion [to dismiss,] from denying the motion as moot to considering the merits of the motion in light of the amended complaint." *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 80 (D. Conn. 1994).  Here, Defendants oppose the proposed Second Amended Complaint based on "futility," which is the same as the Rule 12(b)(6) standard.[17] Accordingly, the

---

[16]Defendants also contend that the motion is untimely since it was not filed within two weeks after oral argument, but the Court disagrees since the motion was filed exactly two weeks after oral argument.
[17]Pursuant to Fed.R.Civ.P. 15, a court should "freely" give leave to amend, "when justice so requires." However, a court may deny leave to amend for any number of "good reason[s], including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (citation omitted).  "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Martin v. Dickson*, No. 03-7917, 100 F. App'x 14, 16, 2004 WL

Court will disregard the Amended Complaint and evaluate the sufficiency of the Second

Amended Complaint under Rule 12(b)(6) in light of all of Defendants' legal arguments.

<u>Rule 12(b)(6)</u>

In that regard, the legal standards to be applied on a motion to dismiss pursuant

to Rule 12(b)(6) are clear:

> To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. May 1, 2018).

> In its review, the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. Jun. 3, 2014) (citations and

internal quotation marks omitted).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929

---

1205185 at *2 (2d Cir. Jun. 2, 2004) (unpublished, citation omitted).

(2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

> First, although a court must accept as true all of the allegations contained in a complaint,[18] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).

"[A]s *Iqbal* makes clear, a plausible claim must come before discovery, not the other way around." *Angiulo v. Cty. of Westchester*, No. 11-CV-7823 CS, 2012 WL 5278523, at *3 (S.D.N.Y. Oct. 25, 2012) (citation omitted); *see also, McBeth v. Porges*, 171 F. Supp. 3d 216, 236 (S.D.N.Y. 2016) (Observing that pursuant to *Iqbal's* pleading standard, "the Federal Rules of Civil Procedure do 'not unlock the doors of discovery for

---

[18]The Court must accept the plausible factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), cert. den. 531 U.S. 1052, 121 S.Ct. 657 (2000).

a plaintiff armed with nothing more than conclusions or speculation.'") (quoting *Iqbal*).

<u>Section 1983</u>

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right.

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004) (citation omitted).

<u>14th Amendment Deliberate Medical Indifference</u>

Plaintiff's first cause of action alleges that Heaster, McGregor, Freely, McKae, Stapleton, Webster, Shellard and Galen violated Mr. Sanchez's 14th Amendment rights by acting with deliberate indifference to his serious medical condition. Defendants have moved to dismiss on behalf of all of these defendants except Freely, Stapleton and Webster. The applicable standard for such claims is clear:

> [Under the] Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-prong test. First, the alleged deprivation of adequate medical care must be "sufficiently serious." Second, the defendant must have acted with deliberate indifference, or a sufficiently culpable state of mind.
>
>                        \*\*\*
>
> The objective prong requires that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain. To determine whether inadequate care is "sufficiently serious," a court must examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the

abstract.

It is well established that the state is not constitutionally obligated to construct a perfect plan for medical care that exceeds what the average reasonable person would expect or avail himself of outside of prison. A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment.

\*\*\*

[Regarding the subjective prong or "mental element,"] deliberate indifference is . . . defined objectively, and the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of serious harm. A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment is required to show only that the prison official acted with objective recklessness, or that the defendant "knew or should have known" that an excessive risk to health or safety would result.

\*\*\*

[S]omething more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort. But distinguishing between negligent and reckless medical care is a difficult task, especially at the motion-to-dismiss stage where courts lack the benefit of expert opinion. The distinction between the two depends on the degree of risk associated with the practitioner's conduct.

*Revels v. Corr. Med. Care, Inc.*, 2018 WL 1578157, at \*4–5 (citations and internal quotation marks omitted).

In moving to dismiss the § 1983 "deliberate indifference" claim against Heaster, McGregor, McKae, Shellard and Galen, Defendants focus primarily on the "subjective" or "mental" prong." That is, Defendants argue that those Defendants' actions do not suggest the requisite mental state (recklessness) to support a deliberate indifference claim.[19] Defendants do *not* argue that Plaintiff has failed to plead a sufficiently serious medical condition. In any event, it cannot really be disputed that the Second Amended Complaint plausibly pleads that Mr.Sanchez's lacerated spleen, and the resulting internal bleeding

---

[19] See, e.g., Defendants' Memo of Law [#17-1] at pp. 2, 3-4, 11-19.

that led to his death, constituted "a condition of urgency, one that may produce death, degeneration, or extreme pain." Accordingly, the Second Amended Complaint adequately pleads the objective prong of a deliberate indifference claim.

As for the subjective or mental prong, Defendants argue that the necessary element of recklessness is lacking as to Heaster, McGregor, McKae, Shellard and Galen based on the following undisputed facts:

Sanchez was promptly seen by medical staff in response to each of his complaints. His vital measurements were taken with extremely high frequency.

They were generally within normal range and, therefore, he was determined to be stable;

Sanchez never exhibited an acute medical emergency. Plaintiff alleges Sanchez was verbal and interactive at each encounter;

Sanchez was provided with medication;

Medical staff listened to Sanchez's bowl sounds;

Sanchez was placed on medical observation and slated to see a provider in the morning, which did occur.

Sanchez was immediately sent to the hospital when he was found to be unresponsive.

Def. Reply [#24] at p. 8.

However, the glaring error in Defendant's argument is the assertion that it is an "undisputed fact" that "Sanchez never exhibited an acute medical emergency." The Court believes, at the pleading stage, that the Second Amended Complaint adequately indicates that Sanchez indeed "exhibited an acute medical emergency." Further, the pleading adequately indicates that the actions taken by Heaster, McGregor, McKae, Shellard and Galen in response to that emergency were so deficient as to suggest

recklessness.

Although Mr. Sanchez technically died at the hospital, the Second Amended Complaint indicates that he essentially bled to death internally at the jail in full view of the individual defendants over a period of many hours in which the only medical care that he received was the administration of two doses of pain medication and the taking of his vital signs through the bars of a cell several times. This was the only care he was provided, despite the fact that he was screaming, writhing on the floor, threatening to kill himself due to the extreme pain and exhibiting symptoms that could not be faked, such as diminished breath sounds in one lung, dropping blood pressure, dropping oxygen saturation, tachycardia and discoloration of his skin. Arguably, these symptoms would have caused a reasonable person to become aware that Sanchez was experiencing some type of serious medical problem besides a dislocated shoulder. Defendants did not contact a doctor or follow the hospital's instructions to return Sanchez to the Emergency Room if his condition worsened. Further, there is the allegation (as yet unproven) that Nurses McGregor and Webster downplayed Sanchez's symptoms on the gamble that he was either just trying to go back to hospital unnecessarily or was being an "asshole."[20]

Based upon these allegations the Court cannot say as a matter of law at this stage of the proceeding that such actions were not reckless. *See, Revels v. Corr. Med. Care, Inc.*, 2018 WL 1578157 at *5 ("[A]ccepting all allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court cannot find as a matter of law that Defendants Fricke and Farley were not reckless."); *see also, Davis v. McCready*, 283 F. Supp. 3d 108, 122 (S.D.N.Y. 2017) ("[I]n *Darnell [v. Pineiro*, 849 F.3d 17 (2d Cir. 2017)],

---

[20] Despite the allegations in the pleading, Defendants insist that as a matter of fact Nurse McGregor was not present during this conversation.

the Second Circuit reaffirmed the vital distinction between mere negligence, and the something greater required to support a constitutional claim. But the distinction may be more difficult for a court to discern on the face of the pleadings in many cases involving medical treatment: evaluated objectively, the distinction between negligent medical treatment and treatment that gives rise to a constitutional claim comes down to the degree of risk associated with the negligent treatment—a question courts may be ill-equipped to answer on the basis of the pleadings alone.").

Heaster, McGregor, McKae, Shellard and Galen nevertheless insist that they were not deliberately indifferent to Sanchez's condition because they responded appropriately to his complaints. Movants contend that any failure to do more or to do something different can only amount to an error of professional judgment, rather than recklessness.[21] However, the Court disagrees. Contrary to Defendants' assertion that Sanchez "did not exhibit an acute medical emergency," the pleading indicates that Defendants recognized that Sanchez needed a doctor but chose to make him wait until a doctor would be at the facility during regular office hours, rather than calling a doctor at home or having Sanchez transported back to the hospital. Moreover, while the medical defendants may not have known exactly what was wrong with Sanchez, they had enough information to conclude that his condition was potentially quite serious inasmuch as it was an excruciatingly-painful condition in the left side of his chest affecting his breathing, blood pressure, heart rate and skin color. Under the circumstances presented, it may have been reckless for

---

[21] See, e.g., Def. Reply [#24] at p. 9 ("Here, Sanchez did not exhibit an acute medical emergency and his complaints were promptly and frequently addressed. In fact, none of Sanchez's complaints were ignored. At no point was any defendant deliberately indifferent to Sanchez. To the extent Plaintiff alleges errors in professional judgment with respect to the *manner and method of addressing complaints*, such constitutes negligence at most, not deliberate indifference.") (emphasis added).

the medical staff to merely continue checking Sanchez's vital signs rather than calling for a doctor. *See, e.g., Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233, 1999 WL 753142 (2d Cir. 1999) (Deliberate indifference may be established where a defendant delays providing necessary medical care for a "fast-degenerating or life-threatening" condition.) (citation omitted) (table).

Similarly, even though Shellard and Galen are not trained medical personnel, under the facts alleged (in which Sanchez repeatedly begged to be taken to the hospital and indicated a desire to kill himself due to the severity of the pain) it may have been reckless for them to respond to the situation by merely telling Sanchez to "settle down" and wait for medical staff to make their rounds, particularly if they had already observed medical staff demonstrating deliberate indifference to his condition over a period of many hours.[22] *See, Feliciano v. Anderson*, No. 15CV4106LTSJLC, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) ("Non-medical personnel may, for example, be deliberately indifferent if they delay access to medical care when the inmate is in extreme pain and has made his medical problems known to the attendant prison personnel.") (citation and internal quotation marks omitted).

The next issue for consideration is whether the second cause of action adequately states a *Monell* claim against Monroe County, Correct Care Solutions, LLC, Correct Care Solutions Group Holdings, LLC and Christine Ross involving the alleged underlying deliberate indifference to Sanchez's medical condition.

> To plead a *Monell* claim, a plaintiff must allege [(1)] the existence of a formal policy which is officially endorsed by the municipality, or [(2)] a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities

---

[22] *See, e.g.*, Second Amended Complaint at ¶ 27 ("[A] corporal noted in his floor activity log that Mr. Sanchez was complaining that his medical needs were not being addressed.").

must have been aware, or [(3)] that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses.

*Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x at 13.

"The inference that a policy existed may . . . be drawn from circumstantial proof[.]" *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *see also, Staten v. Vill. of Monticello*, No. 14-CV-4766 (KMK), 2016 WL 7235796, at *6 (S.D.N.Y. Dec. 13, 2016) ("At the motion to dismiss stage, Plaintiffs need not prove these elements, but they are required to plead them sufficiently to make out a plausible claim for relief. To do so, Plaintiffs must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists.") (citation and internal quotation marks omitted).

Here, Plaintiff appears to rely upon all three of the aforementioned theories of establishing *Monell* liability. On this point, the Second Amended Complaint alleges, upon information and belief, that the defendants

> through *express policy, practices or the inactions of its policy makers*, had a policy and/or practice of not providing appropriate medical care to detainees at the Monroe County Jail and, for Correct Care Solutions, many other local jails across the country. Specifically, these defendants failed to adopt or follow appropriate policies, practices and procedures regarding the emergent medical needs of patients in their care as detailed in the facts [alleged in the Second Amended Complaint]. Correct Care Solutions also failed to employ sufficient and appropriately trained medical and nursing staff, failed to have appropriate nursing and medical protocols in place to address detainee healthcare, and has persistently failed to provide adequate medical care to detainees on numerous occasions. . . . Upon information and belief, one reason why Mr. Sanchez failed to receive adequate medical treatment was because of concerns by the above-listed defendants regarding the expenses involved in properly caring for him and other detainees.

Second Amended Complaint [#26-2] at ¶ ¶ 75-76 (emphasis added).

In support of this *Monell* claim, in addition to the factual averments concerning the

treatment that Sanchez received, the Second Amended Complaint asserts mostly *upon information and belief* the following:  Heaster and McGregor were inexperienced, but were nevertheless placed in charge of deciding whether inmates would be allowed to see a doctor; Correct Care Solutions has been accused of providing inadequate medical care to inmates at other facilities where it provides services, including an inmate in North Carolina who died of untreated opiate withdrawal, an inmate in Virginia who died of dehydration and an inmate in Colorado who died during heroin withdrawal; Correct Care Solutions has been the subject of a newspaper article discussing the aforementioned incidents; Correct Care Solutions has been sued in other cases, including a case in Pennsylvania where a diabetic inmate had a leg amputated, a case in Illinois where an inmate allegedly received inadequate care (and died) after corrections officers broke his neck, and a case in Illinois where an inmate died of dehydration; in one case the New York Commission of Corrections found that nurses employed by Correct Care Solutions provided grossly negligent care to an inmate who died of acute coronary syndrome; the Tennessee State Auditor faulted Correct Care Solutions for understaffing facilities between August 2010 and December 2011; Correct Care's business model, as reflected in its contract with Monroe County, is to use "capitation contracts" under which the costs associated with "medical care provided to detainees come[ ] directly out of [Correct Care's] profit margin" which creates an incentive to "delay or deny care" and to " reduce labor costs" by hiring too few staff and/or inexperienced staff; Correct Care "routinely" has nurses perform "medical diagnoses of detainees" even though diagnosing is "outside the scope of their practice";  Correct Care does not allow nurses to send detainees to the hospital without the approval of a doctor or Health Services Administrator; Correct Care

does not have doctors "on duty in the evening hours" so as to "maximize profits at the expense of detainee health needs"; Monroe County had previously contracted with another medical provider that had "a well-document history of killing and severely injuring inmates," and when Correct Care was hired it retained many of the employees of the former company including defendant Ross; in 2013 and 2014 Ross covered up the fact that Correct Care's staff at the Monroe County Jail had accidentally given the wrong medications to an inmate; and Monroe County was aware of Correct Care's "troubled history" when it hired Correct Care.

These allegations are not sufficient to plausibly state a *Monell* claim against Monroe County. In another case involving Monroe County, the Second Circuit held that a municipality's decision to hire a medical provider that has a "troubled track record in many respects" concerning the provision of care to jail inmates is insufficient to plead *Monell* liability unless it suggests a custom or practice of committing a similar type of violation. *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x at 13. Here, while the Second Amended Complaint describes a number of incidents from other states in which Correct Care allegedly provided inadequate medical care, it does not plausibly plead that Correct Care was actually at fault in those cases. Presumably, anyone could come up with a similar list of grievances against even the best-run medical facility. Nor has Plaintiff plausibly alleged that Monroe County was aware of those other incidents. Further, even assuming that Monroe County had some knowledge of Correct Care's alleged "troubled track record," there are no facts indicating that the aforementioned incidents at other facilities were the result of the type of cost-cutting decisions that supposedly resulted in Sanchez's death. In sum, these allegations are too speculative to state a *Monell* claim

against Monroe County based upon the Correct Care Defendants' alleged constitutional violation. Similarly, Plaintiff has not plausibly alleged a basis for *Monell* liability against the County based upon the alleged constitutional violations by Shellard and Galen.

However, the Court finds that the allegations are sufficient at the pleading stage to state a *Monell* claim against the Correct Care companies and Ross involving Sanchez's death. On this point, it is of course clear that "as a general matter," "a municipal policy cannot be inferred from a single incident of illegality." *Carlisle v. City of Yonkers*, 104 F.3d 352 (2d Cir. 1996) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)). This general rule, though, does not apply if "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. at 824. This action arguably involves not just a single incident, but a series of incidents involving separate actors over a period of at least twelve hours. Indeed, as discussed below it is the consistency of these separate actors' conduct throughout this period which, in part, suggests the existence of a policy. However, even if the action involves a single incident within the meaning of *City of Oklahoma City v. Tuttle*, the Second Amended Complaint includes factual allegations from which the existence of a policy could be inferred.[23]

In particular, the Court believes that the Second Amended Complaint contains sufficient detail from which a reasonable inference could be drawn that during the relevant

---

[23] *But see, Owens v. Clark*, No. 916CV0097GTSDJS, 2017 WL 4357475, at *7 (N.D.N.Y. Sept. 29, 2017) ("Here, the single incident of alleged unconstitutional activity was the alleged act of Defendants Carson, Clemons and Paulino of not providing Plaintiff with pain medication between January 16 and 19, and/or not ordering an x-ray examination of his jaw between January 16 and January 21, 2014. Moreover, the Amended Complaint contains no factual allegation plausibly suggesting that the single incident was caused by an existing, unconstitutional corporate policy, which can be attributed to Defendant CMC.").

time the Correct Care companies had a policy at the Monroe County Jail to have nurses make medical judgments that were beyond their training and expertise in order to avoid having medical doctors on duty during evening hours, in conjunction with a rule prohibiting those same nurses from sending inmates to the hospital without a doctor's approval. In this regard, the Court notes the following facts that have been alleged: During the daytime on February 1, 2015, when doctors were apparently on duty, Sanchez was sent to hospital for treatment of a suspected shoulder dislocation; however, later during the evening and overnight hours when doctors were not on duty and Sanchez was exhibiting much more severe symptoms involving his cardio-pulmonary functioning, he was not sent to the hospital;[24] during the evening and overnight hours Correct Care's staff never contacted a doctor even though Sanchez appeared to be in agony and exhibited problems with his breathing, blood pressure and heart rate; Correct Care's employees recognized that Sanchez needed to see a doctor but required him to wait until the next day; and Correct Care's employees uniformly disregarded the instructions of the doctors at the hospital to return Sanchez to the hospital if his condition worsened. This apparent indifference toward Sanchez's health was not limited to just one Correct Care employee, but rather, several different Correct Care employees observed Sanchez's dire condition over the course of twelve hours and not one contacted a doctor or implemented the hospital's discharge instructions. These facts plausibly suggest the existence of the policy alleged by Plaintiff. Indeed, from the Court's experience it seems unlikely that a group of nurses

---

[24] Defendant contends that these two events actually establish that Correct Care had no policy against sending inmates to the hospital. That is, Defendants argue that the fact Correct Care sent Sanchez to the hospital for a relatively minor injury such as a shoulder dislocation is proof that it had no reluctance to send inmates to the hospital when necessary. However, this argument ignores the timing of the two events: When Sanchez was sent to the hospital for his shoulder injury, it was during the daytime when a doctor was on duty, but when Sanchez was not permitted to go to the hospital, it was during the evening hours when a doctor was not on duty. These facts are consistent with Plaintiff's theory.

or PAs who were *not* constrained by such a policy would have uniformly failed to contact a doctor under similar circumstances.[25]  Additionally, the pleading plausibly alleges that such policy proximately caused Sanchez's injuries.  Consequently, Defendants' motion to dismiss the *Monell* claim against Correct Care Solutions, LLC, Correct Care Solutions Group Holdings, LLC and Ross is denied.

New York State-Law Claims and CPLR § 3012-a

In their reply brief [#24] submitted in support of their motion to dismiss the Amended Complaint, Defendants asserted that the third and fourth causes of action in that pleading, asserting claims for wrongful death and negligence against the Correct Care Solutions Defendants, must be dismissed "for failure to include a CPLR § 3012-a 'Certificate of merit in medical, dental and podiatric malpractice actions.'"[26]  This argument was raised for the first time in Defendants' reply.  The Court has at various times refused to consider arguments raised for the first time in a reply, on the theory that the non-movant did not have an opportunity to address the argument.[27]  Here, however, Plaintiff had such an opportunity when she filed the proposed Second Amended Complaint.  That pleading, though, which is now the operative pleading, again sets forth the third and fourth causes of action as they appeared in the Amended Complaint without addressing Defendants' argument concerning CPLR § 3012-a.  Consequently, Defendant's argument on this point is unopposed.

Nevertheless, the Court still must consider whether CPLR § 3012-a actually applies to the state-law claims as Defendants maintain.  The applicable statutory

---

[25] Of course, Defendants will have the opportunity to prove otherwise.
[26] Reply [#24] at p. 11.
[27] Of course, the non-movant could request an opportunity to file a sur-reply, *see, e.g.*, Local Rule 7(a)(6), but that usually does not happen.

provision requires that a complaint alleging medical malpractice be accompanied by a certificate of merit.  CPLR § 3012-a (McKinney 2018).

> The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can he assessed on the basis of the common everyday experience of the trier of facts.  A claim sounds in medical malpractice when the conduct at issue constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician.  Conversely, a claim sounds in negligence when the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's [or medical provider's] failure in fulfilling a different duty, such as protecting a patient against a risk of falling or adopting proper procedures and regulations [citations omitted].

*Saintime v. Visiting Nurse Serv. of New York*, 53 Misc. 3d 1209(A), 46 N.Y.S.3d 477 (N.Y. Sup. Ct. 2016) (citations omitted).  Similarly, "[w]hile a medical malpractice cause of action may be asserted against a registered nurse for departures from good and accepted nursing practice that proximately cause a plaintiff's injuries, not every act on a nurse's part is an act that qualifies as one which, if not performed with requisite care qualifies as medical malpractice." *Id.*

In this action, the third and fourth causes of action are designated as wrongful death and negligence claims, not medical malpractice claims.  Nevertheless, both claims involve negligence in providing medical care to Sanchez.  In particular, the third cause of action alleges that "the medical care provided to Mr. Sanchez by the Defendants was clearly negligent; in fact it was grossly so," while the fourth cause of action asserts that "failing to treat a patient with a ruptured spleen who is bleeding out internally is negligent, and in fact, it is grossly negligent."[28]  Since such claims "involve [matters] of medical

---

[28] Proposed Second Amended Complaint [#26-2] at ¶ ¶ 80 & 85.

science or art requiring special skills not ordinarily possessed by lay persons," they are medical malpractice claims subject to the requirements of CPLR § 3012-a. *See, Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622 (KMK), 2018 WL 1626348, at *23 (S.D.N.Y. Mar. 29, 2018) ("Plaintiff argues the Certificate of Merit is unnecessary because the claim against Stewart is for ordinary negligence, and not medical malpractice. . . . [However,] Plaintiff alleges Stewart improperly assessed Grimaldi's mental health condition, possible heroin withdrawal side effects, and suicide risk. Because these determinations are a "matter of medical science ... requiring special skills not ordinarily possessed by lay persons," this action involves medical malpractice. [*LaMarca v. U.S.*, 31 F.Supp.2d 110, 121 (E.D.N.Y. 1998)](internal quotation mark omitted). Therefore, Plaintiff was required to serve a certificate of merit[.]").

Plaintiff here did not file a certificate of merit along with the pleading, and therefore did not comply with CPLR § 3012-a. Because of that, Defendants assert that the Court must dismiss those claims, citing *DeFelice v. New York Eye & Ear Infirmary*, 5 Misc.3d 1027(A) (N.Y. Sup.Ct. Nov. 1, 2004).[29]  "However, the mere failure to timely file a certificate of merit does not support dismissal of an action." *Revels v. Corr. Med. Care, Inc.*, 2018 WL 1578157, at *7 (quoting *Calcagno v. Orthopedic Assoc. of Dutchess Cty., PC*, 148 A.D.3d 1279, 1280 (3d Dep't 2017), internal quotation marks omitted).  Here, though, Plaintiff not only failed to file a certificate of merit along with any of the three versions of the Complaint that have been filed so far, but she also failed to address the deficiency after it was pointed out by Defendants and has not offered any explanation. Dismissal is therefore appropriate. *See, Crowhurst v. Szczucki*, No. 16-CV-00182 (JGK),

---

[29] Reply [#24] at p. 12.

2017 WL 519262, at *3 (S.D.N.Y. Feb. 8, 2017) ("[T]he failure to submit the certificate of merit, or present reasons that would excuse the submission, also warrants dismissal of the medical malpractice claim.").  The third and fourth causes of action are dismissed without prejudice.

CONCLUSION

Defendants' motion to dismiss [#17] and Plaintiff's cross-motion to amend  [#26] are both granted in part and denied in part as follows: the Second Amended Complaint [#26-2] is now the operative pleading; the request to dismiss the first cause of action is denied; the request to dismiss the third and fourth causes of action is granted; and the request to dismiss the second cause of action is granted as to Monroe County but denied as to the remaining defendants named in that claim.  The Clerk of the Court is directed to terminate Monroe County as a party to this action. Defendants shall file and serve an answer to the Second Amended Complaint within fourteen days after entry of this Decision and Order.[30]

SO ORDERED.

Dated: Rochester, New York
        December  11, 2018

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[30] *See*, Fed.R.Civ.P. 12(a)(4)(A) ("if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action").